**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **CHAD OSTERHOUT**, ) | |
|  ) | |
| *Plaintiff*, ) | |
|  ) | |
| **vs.** ) | Case No.: CIV-17-99-RAW |
|  ) | |
| **KENDALL MORGAN**, and ) | |
| **BOARD OF COUNTY COMMISSIONERS** ) | |
| **OF LEFLORE COUNTY, OKLAHOMA**, ) | |
|  ) | |
| *Defendants*. ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT BOCC'S SECOND MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** the Plaintiff Chad Osterhout ("Plaintiff" or "Mr. Osterhout") and respectfully submits his Response in Opposition to Defendant BOCC's Second Motion for Summary Judgment (Dkt. #107), as follows:

**Plaintiff's Local Rule 56.1(c) Statement of Facts**

**1.** At all pertinent times, Defendant Kendall Morgan was acting as Undersheriff for the LeFlore County Sheriff's Office ("LCSO"). *See, e.g.,* Morgan Depo. (Dkt. #63-1) at 8:17-23. At all pertinent times, Defendant Jason Timms was a Deputy with LCSO. *See, e.g.,* Morgan Depo. (Dkt. #63-1) at 10:10-17, 11:18 – 12:9. On June 27, 2015, Plaintiff Chad Osterhout had been visiting his friends who live in Fort Smith, Arkansas, including Ben Loggains. *See* Osterhout Depo. (Dkt. #63-2) at 14:16 – 15:25. Mr. Loggains, a physician's assistant by trade, has been friends with Mr. Osterhout since high school. *See* Loggains Depo. (Dkt. #63-3) at 6:13-17, 8:11-22. On the evening of June 27, Mr. Loggains loaned his Honda motorcycle to his visiting friend, Mr. Osterhout. *Id.* at 21:2 – 22:10. Mr. Loggains recommended that Osterhout take the motorcycle on the Talimena Drive, which is a well-known scenic trail that goes from Talimena to Mena. *Id.*

While stopping to get gas for the motorcycle, Mr. Osterhout received a text from a woman, Linda, who he had been communicating with on Facebook. *See* Osterhout Depo. (Dkt. #63-2) at 26:2 – 28:5. Mr. Osterhout called Linda and she asked him to meet up with her at "this Brian person's house…." *Id.* It is now known that this "Brian person" was Brian Smith, who lives in Poteau area on Nubbin Ridge Road. *Id.* at 103:21 – 104:17. Osterhout drove the motorcycle to

1

Brian's house to visit with Linda. *Id.* at 26:2 – 28:5. While at Brian's house on Nubbin Ridge Road, Mr. Osterhout spoke with Linda briefly, spoke with Brian, played horseshoes with Brian, and then left. *Id.* Mr. Osterhout did **not** drink any alcohol or take any drug while at Brain's house. *Id.* In fact, according to Mr. Loggains, Mr. Osterhout **never drinks alcohol or takes narcotics.** *See* Loggains Depo. (Dkt. #63-3) at 21:19 – 22:5. *See also* Osterhout Depo. (Dkt. #63-2) at 83:20-22 ("I haven't drank [sic] alcohol in years.").

Mr. Osterhout did not know Brian Smith prior to meeting him at his house on the evening of June 27, 2015 and has not heard from him since. *See* Osterhout Depo. (Dkt. #63-2) at 24:6 – 25:13. While Defendants describe Brian Smith's house as a known or suspected "drug house", they offer no evidence in support of this bare assertion. Indeed, Undersheriff Morgan does not know whether the LeFlore County Sheriff's Office has **ever** seized or found **any** illegal drug or narcotic at Brian Smith's residence. *See, e.g.,* Morgan Depo. (Dkt. #63-1) at 52:18-22. And Morgan had **never** received **any** calls or complaints about drug activity at Brian Smith's home. *Id.* at 54:3-9. Further, LCSO's "confidential informant" had provided Morgan and the Sheriff's Office with **no information** that drug activity was occurring at Smith's residence. *Id.* at 54:10-17.

**2.** When Mr. Osterhout left Brian Smith's house on the motorcycle, it was not yet dark outside. *See* Osterhout Depo. (Dkt. #63-2) at 27:25 – 28:3. While Mr. Osterhout may have "revved" the engine, as he correctly observes, "it's not illegal to rev your motorcycle." *Id.* at 105:2-7. Osterhout exited Smith's property onto a dirt road. *Id.* at 29:11-17.

**3.** After driving a little way on the dirt road, Mr. Osterhout pulled over and stopped to get a cigarette out of his pocket. *See* Osterhout Depo. (Dkt. #63-2) at 29:18-21. It was at this time that Osterhout first noticed a vehicle behind him, but he did **not** yet recognize that the men in the vehicle were law enforcement officers (now known to be Timms and Morgan). *Id.* at 29:22-24; *see also id.* at 32:1-4. After seeing the car behind him, Mr. Osterhout pulled the motorcycle further over onto the side of the road and motioned for the car to go around him. *Id.* at 29:25 – 30:5. After motioning for the vehicle to go around him, Mr. Osterhout began to take his lighter out of his pocket only to notice that the vehicle began to accelerate toward him at a rapid pace. *Id.* 29:25 – 30:5; 33:11-15. Osterhout was puzzled when the car began accelerating toward him and did not have a good feeling about it. *Id.* at 33:11-15. Still not realizing that the men in the vehicle were law enforcement, Mr. Osterhout "took off" eastbound down the dirt road. *Id.* at 29:25 – 30:5; 31:24-25.

**4.**	Timms and Morgan did **not** activate the emergency lights on their vehicle when they pulled up on Osterhout at the side of the dirt road. *See* Osterhout Depo. (Dkt. #63-2) at 31:10-16.

**5.**	After Mr. Osterhout took off down the dirt road, he was riding at a speed between of 50 and 60 miles per hour. *See* Osterhout Depo. (Dkt. #63-2) at 31:10-16. While riding down the road, Osterhout noticed the vehicle was still pursuing him and that lights had been activated. *Id.* at 34:11-21. However, even after he saw the lights, Mr. Osterhout did not believe the car was a law enforcement vehicle because: (A) the lights were only blue, as opposed to the typical red and blue; and (B) Mr. Osterhout did not hear a siren. *Id.* at 37:21 – 38:12.

**6.**	Again, Mr. Osterhout did **not** hear a siren. *See* Osterhout Depo. (Dkt. #63-2) at 38:11-12; 43:1-4.

**7.**	Mr. Osterhout did stand up on the motorcycle at one point when a bump in the dirt road "kind of flung [him] up…." *See* Osterhout Depo. (Dkt. #63-2) at 41:24 – 42:25. Mr. Osterhout did **not** throw any object from the motorcycle while the motorcycle was moving. *Id.* at 40:19 – 41:6; 106:9-12. The **only** object Mr. Osterhout threw was his cigarette lighter while the motorcycle was immobile. *Id.* While Undersheriff Morgan claimed during his deposition that he saw Osterhout shake a white powder-like substance from a plastic bag, neither he nor Timms made **any mention** of this in the police report (hereinafter, referred to as the "Incident Report"). *Compare* Morgan Depo. (Dkt. #63-1) at 60:16 – 61:22 *with* Incident Report (Dkt. #55-2) at 005. Indeed, Morgan made **no mention** of seeing Mr. Osterhout throw **anything** from the motorcycle in his narrative portion of the Incident Report. *See* Incident Report (Dkt. #55-2) at 005.

**8.**	Again, Osterhout denies that Morgan and Timms activated their siren. *See* Osterhout Depo. (Dkt. #63-2) at 38:11-12; 43:1-4. Mr. Osterhout also denies that he ever reached a speed "in excess of 100 mph" as Defendants claim. *Id.* at 107:2-4; *see also id.* at 34:7-10 (testifying that he reached speeds of 50 to 60 mph before reaching the highway). As Mr. Osterhout reached the end of the dirt road (Nubbin Ridge Road) and turned to cross the highway (HW 271/59), he saw, **for the first time**, the "LeFlore County" markings on the side of Morgan and Timms' vehicle. *Id.* at 37:2-20; 38:13-20. It was at this time -- when Osterhout first realized that the car chasing him was a law enforcement vehicle -- that Osterhout stopped the motorcycle on the side of the highway. *Id.*

**9-10.**	In the Incident Report, Timms claimed that Osterhout "lost control of the motorcycle and wrecked in the ditch" on the side of the highway. *See* Incident Report (Dkt. #55-2) at 005. Similarly, in his portion of the Incident Report, Morgan stated that Mr. Osterhout was traveling

3

at a speed in excess of 100 mph, crossed the highway and "crashed the motorcycle in a ditch." *Id.* During their depositions, however, both Morgan and Timms gave testimony **materially inconsistent** with their statements in the Incident Report.  For instance, Morgan testified that Osterhout was traveling around **1 mph**, **"came to a stop"** and did **not "crash"** into a ditch as he stated in the Incident Report. Morgan Depo. (Dkt. #63-1) at 92:6-23 (emphasis added).  And remarkably, **Timms admitted**, during his deposition, that **he "bumped" the side of the motorcycle,** *with the LCSO vehicle. See* Timms Depo. (Dkt. #63-4) at 4:9 – 5:20 (emphasis added). Timms further admits that he **failed to document**, in the Incident Report, that he bumped Oosterhout's motorcycle. *Id.* at 25:18-23; *See also* Incident Report (Dkt. #55-2) at 005.  Rather, as noted above, Timms inaccurately reported that Osterhout "wrecked" the motorcycle in the ditch. *See* Timms Depo. (Dkt. #63-4) at 25:24 – 26:13.

According to Mr. Osterhout, after he crossed the highway and came to a stop, Morgan and Timms' vehicle "ran right into the back of the motorcycle at the saddlebags." Osterhout Depo. (Dkt. #63-2) at 38:21 – 39:1. Timms concedes that it is "possible" that the LCSO vehicle bumped the motorcycle in the area of the saddlebag. Timms Depo. (Dkt. #63-4) at 6:8-12.  Other witnesses, who observed the motorcycle after the incident, testified that the left side bag was caved in (as if it had been bumped). *See, e.g.,* White Depo. (Dkt. #63-5) at 38:9-16; Loggains Depo. (Dkt. #63-3) at 57:18-25.

When Timms bumped the motorcycle, Mr. Osterhout was "knocked over into the ditch", immediately stood up and put his hands in the air. Osterhout Depo. (Dkt. #63-2) at 38:18 – 39:1. Osterhout did **not** flee or run as Defendants assert. *Id.* at 107:15-23.

Bumping a motorcycle with a law enforcement vehicle is considered to be a use of violent or deadly force. *See, e.g., Walker v. Davis,* 649 F.3d 502, 503–04 (6th Cir. 2011).  Indeed, LCSO policy provides that "firearms or **bumping maneuvers** shall not be employed to stop a pursued vehicle, unless the occupants of the vehicle represent a **direct threat to the life and/or safety of the officer or other persons**, than [*sic*] only as a **last resort** with the approval of the Sheriff and/or Undersheriff." LCSO Policy Manual (Dkt. #63-6) at 91 (emphasis added).  Clearly, Timms violated LCSO Policy by using a bumping maneuver on Osterhout at a time when his motorcycle was either stopped or barely moving and he posed no direct threat to the life or safety of any officer or other person.  *See, e.g.,* Morgan Depo. (Dkt. #63-1) at 137:18-25 ("Q. …If the jury were to accept Mr. Osterhout's version of the events, that he stopped his motorcycle and then Officer Timms

bumped it after he'd stopped it and knocked him off the motorcycle, would that be a violation of this policy? … A. Sure.").

While Defendants argue that Timms "unintentionally" bumped Mr. Osterhout's motorcycle, Timms' intent is an issue of fact for the jury. Plaintiff asserts that the circumstantial evidence, as summarized above, raises several genuine issues of fact as to whether Timms intentionally bumped the motorcycle. In addition, it is well established that "[t]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, ***without regard to their underlying intent or motivation.***" *Graham v. Conner,* 490 U.S. 386, 397 (1989) (emphasis added).

**11.** As noted above, when Timms bumped the motorcycle, Mr. Osterhout was "knocked over into the ditch", and immediately stood up and put his hands in the air. Osterhout Depo. (Dkt. #63-2) at 38:18 – 39:1. Osterhout did ***not*** flee or run as Defendants assert. *Id.* at 107:15-23. Because Mr. Osterhout had his hands up, it is axiomatic he could not have reached for the waistband of his pants as Morgan now claims. In this regard, it is telling that Morgan ***failed to document***, in the Incident Report, ***any alleged observation*** of Mr. Osterhout reaching for the waistband of his pants. *See* Incident Report (Dkt. #55-2) at 005. On the contrary, in the Incident Report, Morgan ***falsely*** stated that he observed Mr. Osterhout's "clinched fist". *See* Morgan Depo. (Dkt. #63-1) at 91:5 – 92:3; and Incident Report (Dkt. #55-2) at 005.

**12.** ***After Mr. Osterhout put his hands up, Morgan struck him in the face with a closed fist and/or flashlight.*** *See* Osterhout Depo. (Dkt. #63-2) at 38:22 – 39:3; 48:6 – 50:16; White Aff. (Dkt. #63-7) at ¶ 7; White Depo. (Dkt. #63-5) at 34:12-25; 37:1-2.

During his deposition, Undersheriff Morgan ***admitted*** that ***he hit Mr. Osterhout in the face*** (around his nose) with a closed fist. *See, e.g.,* Morgan Depo. (Dkt. #63-1) at 80:11-16, 81:24 – 82:7, 93:13-25. Indeed, Morgan ***admits*** that he hit Mr. Osterhout with such force that he ***broke his nose*** and knocked him back onto the ground. *See id.* at 93:13-25. The only dispute is whether Osterhout fled or had his hands up when Morgan punched him in the nose. But, even with this issue, there is evidence that Morgan admitted, in a conversation with a witness named Gene White, that he hit Mr. Osterhout when his hands were up. *See, e.g.,* White Depo. (Dkt. #63-5) at 34:12-25; 37:1-2.

5

Gene White is a retired former saw mill operator who resides in Poteau, Oklahoma and Norman, Arkansas. *See, e.g.,* White Depo. (Dkt. #63-5) at 5:12-17; 6:23 – 7:4. He is also a patient of, and is friends with, Ben Loggains. *Id.* at 18:3-9. At the same time, Mr. White has never met Chad Osterhout. *Id.* at 16:8-11. Undersheriff Morgan remembers meeting with Mr. White, at the LeFlore County Sheriff's Office, on the Monday or Tuesday after the incident involving Osterhout (which occurred on a Saturday). *See* Morgan Depo. (Dkt. #63-1) at 126:8 – 127:24. As Morgan recalls, Mr. White came in, on behalf of Ben Loggains, to inquire as to how to get Mr. Loggains' motorcycle out of impound. *Id. See also* White Aff. (Dkt. #63-7) at ¶¶ 3-4. According to Mr. White, while meeting with the Undersheriff, he began volunteering information about the incident involving Chad Osterhout. *See, e.g.,* White Aff. (Dkt. #63-7) at ¶¶ 6-7; White Depo. (Dkt. #63-5) at 34:12-25; 37:1-2. Pertinently, Morgan stated that **he hit Osterhout in the face after Osterhout's hands were up.** *Id.* Morgan further told Mr. White that he kneed Osterhout in the ribs "a couple of times" after he was handcuffed. *See, e.g.,* White Aff. (Dkt. #63-7) at ¶ 7; White Depo. (Dkt. #63-5) at 36:5-7. According to Mr. White, Morgan was "as proud as [a] cat at the door with a mountain lion" that he had physically beaten Mr. Osterhout. White Depo. (Dkt. #63-5) at 37:3-10.

Morgan also **admits** that he **violated** LCSO **Policy** by **failing to report** that he hit Mr. Osterhout in the face **and** failing to report Mr. Osterhout's visible injuries. *See* Morgan Depo. (Dkt. #63-1) at 142:12 – 143:18. *See also* Morgan Depo. (Dkt. #63-1) at 89:9 – 90:4 ("Q. …Now that you've had a chance to review this narrative again, is it documented anywhere that you hit Mr. Osterhout in the face? A. No, sir."); LCSO Policy Manual (Dkt. #63-6) at 102; and Incident Report (Dkt. #55-2) at 005.

Defendants' assertion that Mr. Osterhout "turned toward [Morgan] in an aggressive manner with clinched fists" (MSJ (Dkt. #55) at 4) is demonstrably inconsistent with Morgan's own testimony. Despite **falsely** alleging (in the Incident Report) that Osterhout turned toward him with a clinched fist, Undersheriff Morgan has since testified that **he did not see** Osterhout's clinched fist. *Compare* Morgan Depo. (Dkt. #63-1) at 91:5 – 92:3 ("Q Okay. But you didn't actually see his fist clinched? A No, sir."); *with* Incident Report (Dkt. #55-2) at 005 ("Mr. Osterhout turned around in an aggressive manner with his fist clinched.").

**13.** Mr. Osterhout did **not** resist arrest or attempt to thwart Timms from placing him in handcuffs. *See, e.g.,* Osterhout Depo. (Dkt. #63-2) at 107:24 – 108:7. After Morgan hit Mr.

6

Osterhout in the face, knocking him down, Osterhout was lying flat on his back with his hands still up. *Id.* at 51:6 – 52:25. While Osterhout was lying docile on his back, with his hands up, Timms and Morgan flipped him over and placed him in handcuffs. *Id.*  **After** Mr. Osterhout had been placed in handcuffs, Undersheriff Morgan stood up and kicked or kneed Osterhout in the ribs. *Id. See also* White Aff. (Dkt. #63-7) at ¶ 7; White Depo. (Dkt. #63-5) at 36:5-7.  After kicking or kneeing Osterhout in the ribs, Morgan yelled: "Don't you ever come back to my town, you hippy motherf---er[!]". Osterhout Depo. (Dkt. #63-2) at 52:3-25.

**14.** After Mr. Osterhout was placed in handcuffs, at approximately 10:29 p.m., EMS of LeFlore County arrived at the scene. *See* EMS Report (Dkt. #63-8) at Plaintiff_000021.  The EMT noted that Mr. Osterhout was bleeding from his nose and forehead. *Id.*  The EMS Report further documents Mr. Osterhout's statements that the "***officer[s] struck [his] motorcycle with [their] vehicle, knocking him to the ground***" and "***he was able to stand up and was holding his hands in the air [when he] was struck by the officer on his face.***" *Id.* (emphasis added).  Thus, unlike Morgan and Timms, Mr. Osterhout has been consistent in his statements about the events of June 27, 2015.

**15.** As Timms admits, there is no evidence that the rolling papers -- that he purportedly found on Nubbin Ridge Road -- actually belonged to Mr. Osterhout. *See* Timms Depo. (Dkt. #63-4) at 18:15-19.  And even if the rolling papers did belong to Mr. Osterhout, possession of cigarette rolling papers is not a crime.

**16.** Timms and Morgan issued Mr. Osterhout a "citation" for DUI despite there being no odor of alcohol on Osterhout's person and despite the fact that they did not administer a Breathalyzer or field sobriety test. *See, e.g.,* Morgan Depo. (Dkt. #63-1) at 88:5 – 89:7.

Undermining Defendants' claim that Mr. Osterhout posed some type of threat to the officers or others, Timms and Morgan did not transfer Osterhout to the LeFlore County Jail after his arrest and treatment at the hospital. *See, e.g.,* Morgan Depo. (Dkt. #63-1) at 120:18 – 122:15; Timms Depo. (Dkt. #63-4) at 21:15 – 22:14. Rather, after Mr. Osterhout received treatment at the hospital, he was released on his own recognizance. *Id.*

While Osterhout, Morgan and Timms were at the hospital, Morgan took a photograph of Mr. Osterhout's face. *See* Morgan Depo. (Dkt. #63-1) at 106:21 – 107:23; ER Photo of Osterhout (Dkt. #63-9).  The photo depicts facial bruising, a bleeding facial laceration and a misshapen and swollen nose. ER Photo of Osterhout (Dkt. #63-9).

7

At the hospital, Mr. Osterhout a was given a CT scan which showed "[a]cute displaced fracturing of the nasal bones", a "[n]asal septal fracture" and "[s]ubtle nondisplaced fracturing of the left orbital roof." CT Scan Report (Dkt. #63-10) at Plaintiff_000015. Mr. Osterhout's injuries required significant surgical intervention. *See* Dr. Mindi Bull Records (excerpt) (Dkt. #63-11) at Plaintiff_000075, 76, 102 and 103.

**17.** In the tort claim letter provided to the Defendant LeFlore County Board of County Commissioners ("BOCC") counsel for Mr. Osterhout provided his address as "c/o Bob Blakemore, Smolen, Smolen & Roytman, PLLC, 701 South Cincinnati, Tulsa, Oklahoma 74119." *See* Tort Claim Letter (Dkt. #55-8).

## Discussion

### I. DEFENDANT BOCC IS *NOT* ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S OKLAHOMA LAW TORT CLAIMS
### A. Defendant's Second Motion for Summary Judgment is Procedurally Improper

As described more fully below, BOCC's Second Motion for Summary Judgment should be denied as it violates: **(A)** the parties' stipulation -- as stated in the April 15, 2019 Joint Status Report -- that no additional dispositive motions were anticipated (*See* Dkt. #93 at 7 of 8); **(B)** the Court's Local Civil Rule 56.1(a), which prohibits the filing of a second motion for summary judgment without leave of court (*See* LCvR 56.1); **(C)** the "law of the case" doctrine; and **(D)** the prohibition of successive motions for summary judgment which raise arguments that could have been raised in the original motion (*See, e.g.,* 3 Motions in Federal Court § 9:22 (3d ed.)).

Defendants, *including* Defendant BOCC, filed their first Motion for Summary Judgment on March 7, 2018 ("First Motion"). *See* Dkt. #55. As part of the First Motion, BOCC raised two arguments. **First**, BOCC argued that Mr. Osterhout's Governmental Tort Claims Act ("GTCA") claims must be dismissed on the ground that he failed to comply with the notice provisions of 51 Okla. Stat. § 156(E). *See* Dkt. #55 at 12-13. More specifically, BOCC asserted that the notice provided was fatally insufficient because Plaintiff did not provide his personal address and telephone number, but rather provided his contact information as "care of" retained counsel. *Id.* **Second,** BOCC asserted, in the alternative, that Plaintiff's negligent use of excessive force and assault and battery claims should be dismissed on the merits.

In addition to the arguments raised by BOCC in the First Motion, the individual Defendants, Kendall Morgan and Jason Timms, argued that they were entitled to qualified immunity on Plaintiff's excessive use of force claims brought pursuant to 42 U.S.C. § 1983. *See* Dkt.

8

#55. Plaintiff filed a comprehensive Response in Opposition to Defendants' First Motion on March 23, 2018. *See* Dkt. #63.

On April 23, 2018, the District Court filed its Order denying in part, and granting in part, Defendants' First Motion. *See* Dkt. #78. Importantly for our purposes here, the Court rejected the arguments raised by BOCC. *Id.* at 10-12. More particularly, the Court held that Plaintiff substantially, and adequately, complied with the GTCA notice provisions. *Id.* at 11. The Court additionally declined to dismiss Plaintiff's Oklahoma tort claims against BOCC on the merits. *Id.* at 11-12.

The Court also noted that BOCC did ***not***, as part of the First Motion, "seek dismissal [of the GTCA claims] … as regards scope of employment." Dkt. #78 at 10. Though, plainly, BOCC could have raised a "scope of employment" argument in the First Motion.

While the Court granted former Defendant Timms' request for qualified immunity, it denied Defendant Morgan qualified immunity. *See* Dkt. #78 at 1-9. The case was then stayed pending the outcome of an immediate appeal filed by Morgan. *See* Dkt. #80.

On February 19, 2019, the Tenth Circuit affirmed the denial of qualified immunity as to Morgan. *See, e.g.,* Dkt. #89. This Court subsequently lifted the stay of litigation. *See* Dkt. #90.

On April 15, 2019, the parties filed a "Joint Status Report". *See* Dkt. #93. In that Joint Status Report, the parties stipulated that ***no additional dispositive motions were anticipated because "[d]ispositive motions have been filed and ruled on."*** *Id.* at 7 of 8 (emphasis added).

On April 16, 2019, the Court entered an Amended Scheduling Order. *See* Dkt. #94. Included in the Amended Scheduling Order is a July 10, 2019 dispositive motions deadline. *Id.* However, the Court did not invite Defendants to file a second motion for summary judgment.

On the contrary, this Court's Local Civil Rule 56.1(a) provides that "[a]bsent leave of Court, each party may file ***only one*** motion under Fed. R. Civ. P. 56." LCvR 56.1(a) (emphasis added). The Court in this case has never indicated that the parties were relieved from the requirements of LCvR 56.1(a).

On July 10, 2019, BOCC filed its Second Motion for Summary Judgment ("Second Motion"). *See* Dkt. #107. The Second Motion should be denied as it violates: **(A)** the parties' stipulation in the April 15 Joint Status Report; **(B)** LCvR 56.1(a); **(C)** the law of the case doctrine;

9

and **(D)** the prohibition of successive motions for summary judgment that raise arguments that could have been raised in the original motion.

First and most simply, BOCC should be held to its prior representation to the Court, in the April 15 Joint Status Report, that additional dispositive motions were ***not*** anticipated because "[d]ispositive motions have been filed and ruled on." Dkt. #93 at 7 of 8. This stipulation was a recognition of the Court's proscription of successive motions for summary judgment without leave. And BOCC's filing of the Second Motion, without obtaining leave of court, was a blatant and unjustified violation of the April 15 stipulation.

Secondly, because BOCC did not seek, let alone obtain, leave of court to file the Second Motion, the Second Motion violates the plain language of LCvR 56.1(a). On these first two grounds alone, the Second Motion should be denied in its entirety.

Nonetheless, even if the Court does not deny the Second Motion for violation of the stipulation and/or LCvR 56.1(a), there are alternative grounds to deny the Second Motion (*i.e,* the "law of the case" doctrine and "arguments that *could* have been raised" grounds stated below).

One of the arguments raised by BOCC in the Second Motion has already been ruled on, and rejected, by this Court. That is, in the Second Motion, BOCC once again avers that Plaintiff's GTCA claims must be dismissed for noncompliance with the notice provisions of 51 Okla. Stat. § 156(E). *See* Dkt. #107 at 7-11. As noted above, BOCC raised this exact same argument in its First Motion. *See* Dkt. #55 at 12-13. And, again, this Court has already rejected the argument in ruling on the First Motion. *See* Dkt. #78 at 11. BOCC's "second bite" at the GTCA notice argument is an improper attempt at reconsideration and an affront to the "law of the case" doctrine. Thus, even if this Court does not strike the Second Motion in its entirety on the first two grounds raised herein, it should strike the "GTCA notice" argument as procedurally inappropriate and contrary to the law of the case doctrine. *See Homans v. City of Albuquerque,* 366 F.3d 900, 904 (10th Cir.2004) (Generally, the "law of the case" doctrine dictates that prior judicial decisions on rules of law govern the same issues in subsequent phases of the same case.).

Lastly, the other argument raised by BOCC in the Second Motion ***could*** have been raised in the First Motion, but was not. Particularly, as part of the Second Motion, BOCC now argues that it is immune from liability under the GTCA because, "if Plaintiff's allegations … are true", Defendant Morgan was acting "outside the scope of his employment." Dkt. #107 at 11-17. As previously observed by this Court in ruling on the First Motion, BOCC did not "seek dismissal [of

10

the GTCA claims] … as regards scope of employment." Dkt. #78 at 10.  Thus, this Court recognized that BOCC could have raised the "scope of employment" argument in the First Motion, but simply chose not to.

It is well-established that "[s]uccessive motions for summary judgment may be procedurally improper if the arguments in the second motion could have been raised in the first motion." 3 Motions in Federal Court § 9:22 (3d ed.) (citing *Brown v. City of Syracuse,* 673 F.3d 141, 114 Fair Empl. Prac. Cas. (BNA) 992, 95 Empl. Prac. Dec. (CCH) P 44492 (2d Cir. 2012)). "'[I]t is improper for a party to file a successive motion for summary judgment which is not based upon new facts and which seeks to raise arguments it could have raised in its original motion.'" *Dyals v. Gregory,* No. CV 212-207, 2014 WL 6682861, at *1 (S.D. Ga. Nov. 25, 2014) (quoting *Campers' World Int'l, Inc. v. Perry Ellis Int'l, Inc.,* 221 F.R.D. 409 (S.D.N.Y. 2004)).  BOCC's argument regarding the "scope of employment", as stated in the Second Motion, does not involve any new facts and plainly could have been raised in the First Motion, but was not.  So, even if the Court determines that the Second Motion should not be denied for failure to abide with the April 15 stipulation or Local Rule 56.1, the "scope of employment" argument should still be denied as a "procedurally improper" topic of a successive motion for summary judgment.

### B. This Court Has Subject Matter Jurisdiction Over Plaintiff's Oklahoma Law Tort Claims, *i.e.*, Plaintiff Complied With the Notice Provision of the GTCA

Plaintiff has brought state law tort claims, for negligent use of excessive force and assault and battery, against Defendant BOCC pursuant to the Oklahoma Governmental Tort Claims Act ("GTCA").  Defendant argues, for the second time, that Mr. Osterhout's GTCA claims must be dismissed on the grounds that he failed to comply with the notice provisions of 51 Okla. Stat. § 156(E).  Defendant's Second Motion for Summary Judgment (Dkt. #107) at 7-11.  More specifically, Defendant asserts that the notice provided was fatally insufficient because Plaintiff did not provide his address and telephone number. *Id.*  However, when the tort claim notice was sent, Mr. Osterhout was represented by counsel.  Therefore, in the tort claim letter, counsel for Mr. Osterhout provided his address as "c/o Bob Blakemore, Smolen, Smolen & Roytman, PLLC, 701 South Cincinnati, Tulsa, Oklahoma 74119." *See* Tort Claim Letter (Dkt. #55-8). Defendant has cited no case which would forbid a represented party from listing his address as "care of" counsel.  The notice provided was more than sufficient to comply with 51 Okla. Stat. § 156.  The state law claims against BOCC should not be dismissed for failure to provide adequate notice.

11

"The OGTCA does not require strict compliance with its notice provision." *Aery v. Nuckolls*, 2016 WL 5795322, at *3 (N.D.Okla., 2016) (*citing Wallace v. Bd. of Cnty. Comm'rs*, 15 P.3d 985, 987 (Okla. Civ. App. 2000). "Substantial compliance is sufficient as long as enough information is provided to fulfill the purpose of the provision." *Aery v. Nuckolls*, 2016 WL 5795322, at *3 (N.D.Okla., 2016) (*citing Kennedy v. City of Talihina*, 265 P.3d 757, 760 (Okla. Civ. App. 2011) (citing *Mansell v. City of Lawton*, 901 P.2d 826, 830 (Okla. 1995))). "Furthermore, the OGTCA should not be construed to 'defeat the ends of justice.' " ." *Aery v. Nuckolls*, 2016 WL 5795322, at *3 (N.D.Okla., 2016) (*quoting Duncan v. City of Stroud*, 346 P.3d 446, 450 (Okla. Civ. App. 2015) (*quoting Reirdon v. Wilburton Bd. of Educ.*, 611 P.2d 239, 241 (Okla. 1980)).

In a 2016 Opinion and Order, The Honorable James H. Payne, United States District Judge for the Eastern District of Oklahoma, found that the OGTCA notice in that case "substantially complied with the OGTCA's notice requirements[,]" despite the fact that the notice did not include the address and telephone number of the claimaint. *Stanley v. Bovos*, 2016 WL 4099115, at *5 (E.D.Okla., 2016). The court in *Stanley* explained that, although the notice was "technically deficient," it "provided [defendant] with sufficient information to investigate and defend against Plaintiff's claim." *Id.* The *Stanley* court also pointed out that the defendant did not argue that the plaintiff's "omission of her address and telephone number prejudiced [defendant] in any way." *Id.*

> Further, as stated in the OGTCA:
>
> Failure to state either the date, time, place and circumstances and amount of compensation demanded, or any information requested to comply with the reporting claims to CMS under *MMSEA* ***shall not invalidate the notice unless the claimant declines or refuses to furnish such information after demand by the state or political subdivision.***

OK ST T. 51 § 156(E) (emphasis added). "While it is unclear precisely what information is subject to the remedy provision of § 156(E), it would defeat the ends of justice to construe the statute to invalidate Plaintiff's notices based on omission of Plaintiff's address and telephone number. *See Crockett v. Cent. Oklahoma Transp. & Parking Auth.*, 231 P.3d 748, 753-54 (Okla. Civ. App. 2010) (Although plaintiff's OGTCA written notice of claim 'did not contain all of the information identified in this statute, section 156(E) is clear; the lack of certain required information does not "invalidate the notice." ')." *Stanley v. Bovos*, 2016 WL 4099115, at *5 (E.D.Okla., 2016).

12

Defendant BOCC is not entitled to summary judgment of Plaintiff's state law claims against it.

### C.  Defendant BOCC is *Not* Immune From Suit for Plaintiff's Oklahoma Law Tort Claims, *i.e.*, The Use of Force by Defendant Morgan Was *Not* Outside the Scope of His Employment

The Oklahoma Governmental Torts Claim Act ("OGTCA") is the exclusive remedy to recover against an Oklahoma governmental entity in tort. *Gowens v. Barstow*, 2015 OK 85, ¶ 12, 364 P.3d 644, 649; *Tuffy's, Inc. v. City of Oklahoma City*, 2009 OK 4, ¶ 7, 212 P.3d 1158; *Speight v. Presley,* 2008 OK 99, ¶ 11, 203 P.3d 173; *Teeter v. City of Edmond,* 2004 OK 5, ¶ 21, 85 P.3d 817; *Nail v. City of Henryetta,* 1996 OK 12, ¶ 10, 911 P.2d 914. Government employees committing torts while performing duties within the scope of their employment subject their employer to liability under the theory of *respondeat superior* under the OGTCA. *See, e.g., Gowens v. Barstow*, 2015 OK 85, ¶ 12, 364 P.3d 644, 650; *Tuffy's, Inc. v. City of Oklahoma City,* 2009 OK 4, ¶ 7, 212 P.3d 1158; *Speight v. Presley*, ¶ 13; *DeCorte v. Robinson,* 1998 OK 87, ¶ 12, 969 P.2d 358. Under this doctrine an employer is generally held liable for the willful acts of an employee acting within the scope of employment. *Gowens v. Barstow*, 2015 OK 85, ¶ 12, 364 P.3d 644, 649–50; *Bosh v. Cherokee County Bldg. Authority,* 2013 OK 9, ¶ 9, 305 P.3d 994. "Scope of employment" is defined in the OGTCA as "performance by an employee acting in good faith and within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority." Okla. Stat. tit. 51 § 152(12). However, "[a]n employer may be held responsible for the tort committed by the employee where the act is incidental to and done in furtherance of the business of the employer even though the servant or **agent acted in excess of the authority or willfully or maliciously committed the wrongs**." *Baker v. Saint Francis Hosp.,* 126 P.3d 602, 605 (Okla. 2005) (emphasis added). *See Perry v. City of Norman,* 341 P.3d 689, 691 (Okla. 2014) (finding "employer liability extends when an employee's conduct is an assault of excessive force if the conduct also occurs within one's scope of employment." *See also Lampkin v. Little,* 286 F.3d 1206, 1213 (10th Cir. 2002) ("a finding that an officer at some time during the episode...went beyond the bounds of good faith...is not necessarily inconsistent with a finding that the officer acted within the scope of employment").

Defendant BOCC's "PROPOSITION II" includes two arguments. Firstly, Defendant argues for the dismissal of Plaintiff's assault and battery claims on the grounds that, as a matter of law, it cannot be held liable for an assault and battery committed by Defendant Morgan or any of its law enforcement officers. Secondly, Defendant argues that, because "there can be no doubt that

13

Defendant Morgan intentionally meant to physically harm the Plaintiff, assuming the truth of Plaintiff's allegations that Defendant Morgan hit him in the face with a closed fist and/or flashlight while his hands were up and that Morgan kicked or kneed him in the ribs after he had been placed in handcuffs[,]" ((Defendant's Second Motion for Summary Judgment (Dkt. #107) at 14), "the only reasonable conclusion which can be drawn from Plaintiff's allegations regarding Defendant Morgan's actions is that he did not act within the scope of his employment relative to Plaintiff's claims[,]" *Id* at 12. Both of Defendant's arguments are without merit.

The Oklahoma Supreme Court's Opinion in *Nail v. City of Henryetta*, 911 P.2d 914 (Okla. 1996) is the authority most on point and governs both of the BOCC's proposition concerning immunity. Defendant's Second Motion fails to distinguish the case at bar from *Nail* in any way. In *Nail*, the dispositive question presented to the court was whether or not a City of Henryetta police officer ("City Police Officer") was acting within the scope of his employment when he shoved an arrestee ("Arrestee") thereby subjecting the City of Henryetta ("City") to tort liability under the OGTCA. *See, Nail* at 914-916.

Notably, like Plaintiff in the case at bar, Arrestee brought causes of action against the City, pursuant to the OGTCA, for both assault and battery and negligence under a theory of *respondeat superior*. The Oklahoma Supreme Court, in its Opinion, specifically distinguishes assault and battery and negligent use of force tort claims from claims "which necessarily include[] elements of bad faith." *Id.* at 916-917.

Ultimately, the court in *Nail* found "that the question of whether the police officer was acting within the scope of employment when he shoved Nail is a jury question[;]" and that "[a]lthough the City does not dispute that the police officer shoved Nail during Nail's arrest, a question remains as to whether Officer Baldwin was acting maliciously and in a willful and wanton manner when he pushed Nail, or whether he was merely negligent." *Id.* at 918. In so finding, the *Nail* court distinguished *Nail* with cases with the abnormal situation "where only one reasonable conclusion can be drawn from the facts[;]" *Id.* As Defendant's motion cites to nothing in the record or any undisputed fact establishing that Morgan acted in bad faith and/or a wanton and malicious manner, the case at bar is far from a case "where only one reasonable conclusion can be drawn from the facts[;]" and the question of whether Morgan was acting within the scope of his employment should be answered by a jury. *Id.*

14

In Oklahoma, assault and battery claims "are subject to additional requirements when asserted as against a police officer." *Payne v. Myers,* 2015 WL 5775188, at *11 (N.D. Okla., 2015). Under Okla. Stat. tit. 21 § 643(1), "an action for assault and battery will not lie for the use of force 'when ***necessarily committed*** by a public officer in the performance of any legal duty...'" *Madoux v. City of Norman,* No. CIV-07-435-M, 2007 WL 4171558, at *5 (W.D. Okla. Nov. 20, 2007) (alteration omitted) (quoting Okla. Stat. tit. 21, § 643(1)) (emphasis added). However, ***"[a]n officer's use of force is not 'necessarily committed' where such force is excessive or unreasonable***." *Payne v. Myers,* at *11. *See also, Thetford v. Hoehner,* No. 05-CV-0405-CVE-FHM, 2006 WL 964754, at *6 (N.D. Okla. Apr. 12, 2006); *Morales v. City of Oklahoma City ex rel. Oklahoma City Police Dep't,* 230 P.3d 869, 879-80 (Okla. 2010). Similarly, in Oklahoma, "[b]ecause, however, the act of making an arrest necessarily involves some risk of harm to the arrestee, 'a police officer has a special dispensation from the duty of ordinary care not to endanger others.'" *Payne v. Myers,* No. 14-CV-39-GKF-TLW, 2015 WL 5775188, at *13–14 (N.D. Okla. Sept. 30, 2015) (quoting *Morales,* 230 P.3d at 880). "In particular, '[a] police officer's duty ... is to use only such force in making an arrest as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the arrest.'" *Id.* The additional protection afforded police officers in Oklahoma under both the assault and battery and negligent use of force standards reflect an understanding that police officers must regularly, in the scope of their employment, intentionally use force which will cause the arrestee to be injured or even killed. Just because a police officer intentionally strikes, "Tazes" or shoots an arrestee in the line of duty does not mean the officer was acting in bad faith and/or with malice. Of course, just because an officer strikes, "Tazes" or shoots an arrestee in good faith does not mean that the officer's use of force was necessarily committed.

While clearly excessive, Morgan's acts were "incident to...service[s] being performed for [his] employer or ar[ose] out of an emotional response to actions being taken for the employer." *Rosebush v. Oklahoma Nursing Homes, Ltd.,* 1993 OK 160, 867 P.2d 1241, 1245. Thus, the Defendant BOCC is vicariously liable for Morgan's assault and battery and/or negligent use of excessive force. At a minimum, whether Morgan's assault and battery and/or negligent use of excessive force against Plaintiff was within the scope of his employment under the OGTCA is a question of fact that should be determined by a jury. *See, Perry v. City of Norman,* ¶ 19 ("[T]he plaintiff's remedy belongs exclusively within the confines of the OGTCA and a jury's determination concerning

whether the police officers were acting within the scope of their employment under the OGTCA."); *see also, Nail v. City of Henryetta,* 911 P.2d 914, 918 (Okla. 1996) ("The question of whether an employee has acted within the scope of employment at any given time is normally a question for the jury, except in cases where only one reasonable conclusion can be drawn from the facts.").

BOCC is not entitled to summary judgment on Plaintiff's negligent use of excessive force; and assault and battery claims brought pursuant to the GTCA.

**WHEREFORE**, premises considered, Plaintiff respectfully requests that this Court deny Defendant BOCC's Second Motion for Summary Judgment (Dkt. #107).

Respectfully,

/s/ Robert M. Blakemore
Daniel Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone:  (918) 585-2667
Fax:  (918) 585-2669

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of July 2018, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/ Robert M. Blakemore